No. 2023-1556

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

**TEAM SYSTEMS INTERNATIONAL, LLC**
*Appellant*

v.

**SECRETARY OF THE DEPARTMENT
OF HOMELAND SECURITY**,
*Appellee*

———————————————

Appeal from the Civilian Board of Contract Appeals in
CBCA No. 7145, Judge Patricia J. Sheridan

———————————————

**REPLY BRIEF OF APPELLANT
TEAM SYSTEMS INTERNATIONAL, LLC**

———————————————

Lindsay M. Reed
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-4278
lmreed@venable.com

James Y. Boland
VENABLE LLP
1850 Towers Crescent Plaza, Suite 400
Tysons, VA 22182
(703) 760-1997
jyboland@venable.com

*Counsel for Appellant Team Systems
International, LLC*

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......................................................................... i

TABLE OF AUTHORITIES ................................................................... iii

ARGUMENT .........................................................................................1

   A. The Plain Language of CLIN 0005 Supports TSI's
      Interpretation ................................................................................1

   B. Other Tenets of Contract Interpretation Disfavor FEMA's
      Interpretation. ..............................................................................5

   C. The Board Erroneously Disregarded Expert Reports And
      Binding Precedent in *Metric Constructors* .............................10

      1. FEMA Mischaracterizes Metric Constructors, Which Is
         Binding Precedent And Obligated The Board To
         Consider TSI's Expert Reports. ...........................................10

      2. TSI Demonstrated Reasonable Reliance On Trade
         Practice And Custom. ...........................................................15

      3. TSI Preserved Its Right To Engage in Expert Discovery
         and Timely Submitted Expert Reports. ................................16

      4. The Board's Exclusion Of Expert Reports On The Basis
         That The Board Already Interpreted The Contract Was
         Legal Error…… ...................................................................20

      5. FEMA Did Not Timely Produce Expert Reports. ...............22

   D. FEMA Does Not Explain Its Contemporaneous Description
      of CLIN 0005 As A "Penalty" And The Application Of The
      Restocking Fee To "Unshipped Loads." ..................................23

   E. The Board's Refusal To Consider The Florence Task Order
      Was Error. ...................................................................................24

F.  If TSI's Interpretation Is Not The Only Reasonable One, *Contra Proferentem* Applies. ....................................................................28

CONCLUSION AND STATEMENT OF RELIEF ................................................28

# TABLE OF AUTHORITIES

**Cases**

*Alvin, Ltd. v. U.S. Postal Serv.,*
    816 F.2d 1562 (Fed. Cir. 1987) .......................................................7

*Aycock Eng'g, Inc. v. Airflite, Inc.,*
    560 F.3d 1350 (Fed. Cir. 2009) ............................................. 20, 23

*Beta Sys., Inc. v. United States,*
    838 F.2d 1179 (Fed. Cir. 1988) .....................................................19

*Brooklyn Life Ins. Co. of N.Y. v. Dutcher,*
    95 U.S. 269 (1877)........................................................................28

*Central Eng'g & Const. Co. v. United States,*
    103 Ct. Cl. 440 (1945) ..................................................................28

*Chase & Rice, Inc. v. United States,*
    354 F.2d 318 (Ct. Cl. 1965)...........................................................27

*DJ Mfg. Corp. v. United States,*
    86 F.3d 1130 (Fed. Cir. 1996) .........................................................8

*Hunt Const. Grp., Inc. v. United States,*
    281 F.3d 1369 (Fed. Cir. 2002) .....................................................13

*Jowett, Inc. v. United States,*
    234 F.3d 1365 (Fed. Cir. 2000) ............................................. 12, 13

*Lockheed Martin IR Imaging Sys. v. West,*
    108 F.3d 319 (Fed. Cir. 1997) .......................................................10

*Metric Constructors, Inc. v. NASA,*
    169 F.3d 747 (Fed. Cir. 1999) ............................................. passim

*Mingus Constructors, Inc. v. United States,*
    812 F.2d 1387 (Fed. Cir. 1987) .....................................................18

*N. Pac. Emergency Exp. Ass'n. v. United States,*
    95 Ct. Cl. 430 (1942) ....................................................................24

*Northwest Title Agency, Inc. v. United States*,
    855 F.3d 1344 (Fed. Cir. 2017) ....................................................12

*Pacific Gas & Elec. Co. v. United States*,
    536 F.3d 1282 (Fed, Cir. 2008) ......................................................7

*Peterson Indus. Depot, Inc. v. United States*,
    140 Fed. Cl. 1 (2018)......................................................................9

*Premier Office Complex of Parma, LLC v. United States*,
    916 F.3d 1006 (Fed. Cir. 2019) ....................................................12

*Promac, Inc. v. West*,
    203 F.3d 786 (Fed. Cir. 2000) ......................................................19

*Reliable Contracting Grp., LLC v. Dep't of Veterans Affs.*,
    779 F.3d 1329 (Fed. Cir. 2015) .................................................4, 28

*Shell Oil Co. v. United States*,
    751 F.3d 1282 (Fed. Cir. 2014) ....................................................12

*Sterling Federal Sys., Inc. v. Goldin*,
    16 F.2d 1177 (Fed. Cir. 1994) ......................................................22

*Supreme Foodservice GmbH v. Dir. of Def. Logistics Agency*,
    54 F.4th 1362 (Fed. Cir. 2022) .....................................................21

*WDC W. Carthage Assocs. v. United States*,
    324 F.3d 1359 (Fed. Cir. 2003) .......................................26, 27, 28

**Other Authorities**

Restatement (Second) of Contracts § 203(a) .....................................7, 11

**Regulations**

48 C.F.R. § 16.202-1 .........................................................................3, 6

48 C.F.R. § 16.301-1 ...........................................................................7

48 C.F.R. § 52.216-7(b) .......................................................................7

# ARGUMENT

## A. The Plain Language of CLIN 0005 Supports TSI's Interpretation.

The Federal Emergency Management Agency ("FEMA") does not identify any language that explicitly says CLIN 0005 applies only to the extent the contractor incurs cost physically restocking bottled water—that language does not exist in the IDIQ Contract or Maria Task Order. FEMA's interpretation reads such a requirement into the CLIN, which is contrary to principles of contract interpretation when the contract is otherwise clear.

If FEMA intended for CLIN 0005 to apply only when Team Systems International, LLC ("TSI") incurs cost physically restocking canceled orders—as opposed to applying the CLIN when orders are canceled, as the CLIN expressly states—it would have said so in the CLIN description, just as it did for the other "Additional Contract Requirements" CLINs in the same section of the IDIQ Contract, and just as it later did in the follow-on contract. *See* APPX0355 (FEMA revising CLIN 0005 to require "proof of cost incurred").

FEMA's argument rests on the title of CLIN 0005, "Restocking Fee." FEMA insists that the fee must be limited to situations when TSI physically restocks bottled water because the title says restocking. TSI's expert reports demonstrated that "restocking fee" ordinarily means, and is regularly used interchangeably with, "cancelation fee."

But even without expert testimony, FEMA's interpretation[1] is unreasonable because it starts by using the title "restocking fee" to define "restocking fee" as a fee applicable only when canceled orders are physically restocked and the contractor incurs costs—something the title does not say and the CLIN type (fixed price) does not contemplate. Having defined the CLIN based only on the title, FEMA then reads the CLIN's two descriptive sentences as merely establishing *conditions* for the fee, as opposed to *defining* the CLIN itself.

FEMA says the first sentence—"[t]he initial ordered quantity either decreases or the order is cancelled"—does not define the CLIN fee, but instead conditions eligibility for the fee only when the initial ordered quantity either decreases or the order is canceled. *See* FEMA Br. at 16. FEMA argues that restocking for any other reason, "such as in the ordinary course of business or in connection with the performance of the contract," would not entitle TSI to the fee. These alternative scenarios, however, are pure fiction.

Since the Maria Task Order is fixed price, there are no circumstances under which FEMA would ever be obligated to pay TSI for restocking bottled water other than if FEMA canceled or reduced any order. FEMA does not provide any examples

---

[1] FEMA alleges that TSI "claims that the task order at issue altered FEMA's obligations," FEMA Br. at 16 n.1, but does not cite where TSI allegedly made such an argument. TSI agrees with FEMA that the IDIQ Contract terms apply.

in its brief, yet without alternative scenarios, the first sentence would be redundant and meaningless.

FEMA says the second sentence—"[t]he fee covers the costs of restocking decreased or cancelled order to the Contract"—indicates what the restocking fee "covers." FEMA Br. at 19. That portion of FEMA's analysis is correct, but then FEMA argues that since the purpose of the fee is to cover restocking costs, TSI must incur some nominal restocking costs to be eligible for the fee. However, nothing in the CLIN says TSI must first incur costs. By law, the incurrence of cost on a fixed price contract is irrelevant and cannot be the basis for adjusting a fixed fee. *See* 48 C.F.R. § 16.202-1 ("A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."). FEMA does not address this regulation in its brief, nor does it identify any precedent in government contracting where the incurrence of actual cost (regardless of amount) is necessary for the payment of a fixed fee.

Unlike terms such as "reimbursement" or "compensate," the term "cover" does not mean that incurrence of actual cost is necessary. FEMA correctly recognizes that the purpose of the restocking fee is to be "provided in lieu of actual costs incurred for restocking," FEMA Br. at 20, yet fails to recognize that a fee negotiated before any costs are known "covers" zero restocking costs just as much as it "covers" significant restocking costs. In both instances, the pre-negotiated fee

covers the contractor's costs and fully resolves any future claim associated with restocking a canceled or reduced order.[2] Like all fixed price contracting, the fee reflects the parties' agreement to share risk. Fixed priced contracting benefits FEMA when actual restocking costs are higher while benefitting TSI if its actual restocking costs are lower or even zero. By arguing that TSI must demonstrate that it incurred nominal restocking cost, FEMA is introducing words into the contract that do not exist.

In contrast to FEMA's interpretation, TSI's interpretation relies on the two sentences to *define* "restocking fee," as those are the only other words in the contract explaining the meaning of CLIN 0005. When interpreting a contractual term, a court should begin by looking at the contract's definition. *See, e.g., Reliable Contracting Grp., LLC v. United States*, 779 F.3d 1329, 1333 (Fed. Cir. 2015) (looking first to determine if contract defined "new" before concluding the term was ambiguous). Rather than assume the parties failed to define "restocking fee" and merely described conditions for the fee, this Court should look to the IDIQ Contract's description of "restocking fee" to determine how the parties defined it.

---

[2] As TSI explained in its opening brief, anticipating or ascertaining actual restocking fees that might be charged by suppliers would be difficult, especially under emergency contracting conditions. The fixed fee "covers" these future unknown costs. Since the fee also provides assurances of minimum payment before TSI places an order, TSI was able to quote a lower price for the delivery quantity.

Viewed this way, the first sentence in the CLIN identifies the only event that determines when the fee applies—FEMA's cancelation or reduction of an initial ordered quantity. The second sentence merely explains the purpose of the fee—to cover costs of restocking the canceled or reduced quantity. A fee that is paid upon the cancelation or reduction of an order for purposes of covering any costs of restocking is reasonably called a "restocking fee," even if no physical restocking occurs or in some instances the contractor may not actually incur restocking costs. The parties could have entitled the CLIN "cancelation fee," but as TSI demonstrated with expert testimony, it is common in the industry to use restocking fee and cancelation fee interchangeably.

Regardless, the CLIN description defines "restocking fee" and its language is straightforward. It does not say TSI must physically restock bottled water after a cancelation, nor does it say TSI must incur actual cost before FEMA will pay the entire fee—language that is indispensable for FEMA's interpretation but found nowhere in the text. TSI's interpretation harmonizes the language of the contract and does not introduce any words into the contract or render any meaningless.

## B. Other Tenets of Contract Interpretation Disfavor FEMA's Interpretation.

First, FEMA's view of CLIN 0005 is unreasonable because it is contrary to the Federal Acquisition Regulation. FEMA summarizes its interpretation as follows:

> [W]e agree that a restocking fee is to be provided in lieu of actual costs incurred for restocking. *Reimbursement* is to be based upon the number of units that are restocked, *rather than the actual cost* of restocking. But that does not relieve TSI of the burden of demonstrating that it was required to restock, *incurring restocking costs in the first instance*. The existence of such costs, *rather than the actual amount of such costs*, is what is relevant.

FEMA Br. at 20 (emphasis added).

A fixed price contract "is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." 48 C.F.R. § 16.202-1. For this reason, contractors performing under fixed price contracts are not required to maintain cost records or otherwise demonstrate any incurred costs. FEMA's interpretation violates this regulation and imposes an unstated "burden," seeking not only to adjust but outright eliminate CLIN 0005's fixed price on the basis of TSI "incurring restocking costs in the first instance." The incurrence of costs is irrelevant under a fixed price contract. FEMA has already admitted that CLIN 0005 is fixed price. *See* APPX0394 ("[T]he Restocking Fee is a fixed price CLIN"). FEMA's brief does not respond to this argument nor harmonize its interpretation with this regulation.

The Federal Acquisition Regulation also does not recognize the concept of paying a fixed price so long as the contractor demonstrates that it incurred actual cost without any regard to the "actual amount of such costs." The Maria Task Order was not a cost-reimbursement contract and did not contain a single cost-type clause

signaling that the contractor has a "burden" to demonstrate incurred costs. FEMA erroneously states that CLIN 0005 provides for "reimbursement," but that term, along with the concept of "incurred" costs, applies exclusively to cost-reimbursement contracting. *See, e.g.,* 48 C.F.R. § 52.216-7(b) (providing for the reimbursement of "costs incurred"); 48 C.F.R. § 16.301-1. FEMA's interpretation relies on principles and concepts of cost-type contracting that do not apply to this contract. FEMA's brief does not respond to TSI's argument that its interpretation would result in a hybrid CLIN that is fixed price yet also dependent on the incurrence of cost irrespective of the "actual amount of such costs"—an unprecedented concept not found in the Federal Acquisition Regulation.

An interpretation that is inconsistent with law is not preferred. *See* Restatement (Second) of Contracts § 203(a) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"); *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1288 (Fed. Cir. 2008) (citing Restatement (Second) of Contracts § 203(a) as authority).

Second, FEMA's interpretation leads to an irrational result. Federal Circuit precedent requires this Court to prefer a "reasonable meaning over one that achieves a 'weird and whimsical result.'" *Alvin, Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1566 (Fed. Cir. 1987) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)).

Before the Board, FEMA argued that TSI is entitled to $13,504,320 if it incurred just $10 or even $0 restocking the 67,521,600 canceled liters, but is entitled to $0 if it did not physically restock any liters. *See* APPX0395. FEMA argued that the "only relevant factor is the quantity of bottles restocked." *Id.*

In contrast, here, FEMA argues "[t]he existence of such costs, rather than the actual amount of such costs, is what is relevant." FEMA Br. at 20. It is irrational and would lead to a "whimsical" result to interpret CLIN 0005, as FEMA does here, such that TSI would receive full payment of the CLIN if TSI incurs nominal restocking costs of $10 but zero payment if it incurs no restocking costs. There is no rational basis for treating these two scenarios differently. FEMA's brief does not explain its inconsistent positions or address the irrational and whimsical result of its interpretation.

TSI's interpretation, however, does not lead to an irrational result. Like a liquidated damages provision, it reasonably fixes FEMA's liability for restocking in advance in the event it cancels or reduces an order irrespective of TSI's actual restocking costs, "sav[ing] the time and expense of litigating the issue of damages." *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1133 (Fed. Cir. 1996).

<u>Third</u>, FEMA's interpretation conflicts with the *expressio unius est exclusio alterius* canon, which provides that the expression of one thing is the exclusion of the other. "Where certain things are specified in detail in a contract, other things of

the same general character relating to the same matter are generally held to be excluded by implication." *Peterson Indus. Depot, Inc. v. United States*, 140 Fed. Cl. 1, 13 (2018), *aff'd*, 778 F. App'x 963 (Fed. Cir. 2019).

Each CLIN in the "Additional Contract Requirements" section, other than CLIN 0005, contains express language specifying a condition for payment. For example, for Drop Trailer (CLIN X003AA), the parties agreed that the fee would apply only "based on actual drop days." APPX0072. CLIN 0005 is the only "Additional Contract Requirements" CLIN that identifies the occurrence of an event ("[t]he initial ordered quantity either decreases or the order is cancelled") without a similar type of *express* condition on payment found in the other CLINs that FEMA argues should also apply to CLIN 0005. Since the parties did not include a similar express condition in CLIN 0005, they did not intend for one to apply.

FEMA's only response is that there "*are* express conditions for the payment of the [CLIN 0005] fee, however minimal," FEMA Br. at 21 (emphasis in original), but does not cite any. FEMA merely repeats its argument that TSI must "demonstrate[e] that it has incurred cost of restocking," *id.*, which is not expressly stated anywhere in the contract. Instead of citing express language in CLIN 0005 supporting its interpretation—even "minimal" express language—FEMA cites the IDIQ Contract's standard invoice instructions, *see id.* (citing APPX0046), but those instructions say nothing about CLIN 0005 much less require TSI to demonstrate that

it incurred restocking costs to receive payment. Reading the CLIN "as part of an organic whole," *Lockheed Martin IR Imaging Sys.*, 108 F.3d at 322, the parties did not intend to subject CLIN 0005 to a similar express condition for payment.

### C. The Board Erroneously Disregarded Expert Reports And Binding Precedent in *Metric Constructors*.

Even if this Court otherwise agrees with FEMA's interpretation, the Board clearly erred by refusing to consider expert testimony.

### 1. FEMA Mischaracterizes Metric Constructors, Which Is Binding Precedent And Obligated The Board To Consider TSI's Expert Reports.

This Court made clear in *Metric Constructors* that when a contractor presents evidence that a contract term has an accepted industry meaning, the "context" in which the parties entered into a contract, including evidence of trade practice, is a necessary consideration before a court can conclusively determine if a contract is ambiguous or unambiguous:

> *Before* an interpreting court can conclusively declare a contract ambiguous or unambiguous, *it must consult the context in which the parties exchanged promises*. Excluding evidence of trade practice and custom because the contract terms are "unambiguous" on their face ignores the reality of the context in which the parties contracted. That context may well reveal that the terms of the contract are not, and never were, clear on their face. On the other hand, that context may well reveal that contract terms are, and have consistently been, unambiguous.
>
> Thus, evidence of trade practice and custom plays an important role in contract interpretation. *Before* arriving at a legal reading of a contract provision, a court must consider the context and intentions of the

parties. That context may or may not disclose ambiguities. In any event, evidence of trade practice and custom *is part of the initial assessment of contract meaning*. It illuminates the contemporaneous circumstances of the time of contracting, giving life to the intentions of the parties. It helps pinpoint the bargain the parties struck and the reasonableness of their subsequent interpretations of that bargain.

169 F.3d at 752 (emphasis added). *See also id.* at 753 (citing Restatement (Second) of Contracts § 220 cmt. d for the same proposition). TSI introduced evidence of this "context," including expert testimony that "restocking fee" has a customary meaning in the industry, FEMA's contemporaneous characterization of CLIN 0005 as a "penalty," and FEMA's treatment of the same CLIN under a different task order under the same IDIQ Contract—all of which the Board excluded from the record or otherwise did not consider because it had already interpreted the contract against TSI.

FEMA argues that interpretations of *Metric Constructors* as requiring consideration of trade practice before determining if there is an ambiguity "has been explicitly rejected by this Court in numerous cases," FEMA Br. at 27, but this argument is misleading and fails to acknowledge distinguishing facts.

The Federal Circuit has not overturned *Metric Constructors*, and it remains binding precedent.[3] In *Jowett, Inc. v. United States*, 234 F.3d 1365 (Fed. Cir. 2000),

---

[3] This Court continues to cite *Metric Constructors* as precedent. *See, e.g., Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir.

this Court rejected a contractor's distortion of *Metric Constructors* as providing that "when the language of the contract does not reflect industry practice, the contract is ambiguous and consequently the evidence of industry practice is admissible to aid in the interpretation of the contract." *Id.* at 1368. *Jowett* rejected this mischaracterization of *Metric Constructors*, noting that the key to *Metric Constructors* was that there was a "term in the contract that has an accepted industry meaning different from its ordinary meaning." *Id.* at 1369.

The contractor in *Jowett* did not present evidence that a contract term had an accepted industry meaning. Rather, it tried to use industry custom to change the plain and ordinary meaning of language requiring it to insulate all supply ducts, insisting that it was industry practice to insulate only return ducts. In denying the appeal, this Court did not limit *Metric Constructors*, but merely confirmed the longstanding rule that a contractor may not use "industry practice to create an ambiguity." *Id.* at 1368.

In *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369 (Fed. Cir. 2002), the Federal Circuit rejected a similar argument that "trade practice can render a contract ambiguous that is otherwise clear on its face" based on a distorted reading of *Metric Constructors*. This Court again did not diminish *Metric Constructors*, but pointed out that *Jowett* "recognized that evidence of trade practice may be useful in

_____

2019); *Northwest Title Agency, Inc. v. United States*, 855 F.3d 1344, 1347 (Fed. Cir. 2017); *Shell Oil Co. v. United States*, 751 F.3d 1282, 1296 (Fed. Cir. 2014).

interpreting a contract term having an accepted industry meaning different from its ordinary meaning—even where the contract otherwise appears unambiguous—because 'the parties to a contract ... can be their own lexicographers and ... trade practice may serve that lexicographic function in some cases.'" *Id.* at 1373 (quoting *Jowett*, 234 F.3d at 1368).

FEMA insists that "TSI makes the same argument on appeal" that this Court rejected in *Jowett*. FEMA Br. at 27. This argument completely mischaracterizes the facts and applicable precedent. Unlike the contractor in *Jowett*, *Hunt*, and the other cases cited by FEMA, TSI presented evidence that the term "restocking fee" has an accepted industry meaning that is different from its ordinary meaning. In the bottled beverage industry, the term is synonymous with "cancelation fee" and provides for the automatic payment of a fee upon cancelation of an order without proof of restocking costs.

The contractors in *Jowett* and *Hunt* tried to change the terms of the contract to conform to industry practice, thus impermissibly seeking to create an ambiguity where none existed. In contrast, TSI's expert reports do not seek to rewrite the contract around industry practice, but provide essential meaning to the term "restocking fee" as understood by the parties and industry. This is exactly what the contractor did in *Metric Constructors* and what led this Court to rely on "evidence show[ing] that the electrical industry commonly uses the term 'relamping' to mean

the total replacement of lamps at a particular facility" to interpret the contract against the government. *Id.* at 753.

The board in *Metric Constructors* "accorded [trade usage] evidence no weight 'in light of the clear words' of the contract." *Id.* at 749. This Court should reverse the Board here for the same reason it did in *Metric Constructors*. TSI provided expert testimony showing trade usage of the term "restocking fee" by the Board's deadline and before any entry of judgment. Yet the Board excluded this evidence from the record, preventing TSI from even presenting the evidence for consideration.

The Board justified its decision by explaining, with circular reasoning, that the expert reports "would not have changed that decision because the contract is not ambiguous, and the Board's focus has always been on whether TSI actually incurred restocking fees." APPX0011. *See also* APPX0012 (mischaracterizing *Metric Constructors* and TSI's argument). In other words, since the Board already interpreted the contract (before any fact or expert discovery began), it refused to consider evidence that "restocking fee" has a meaning that is different from its ordinary meaning—evidence that this Court specifically requires interpreting boards to consider "[b]efore" it "can conclusively declare a contract ambiguous or unambiguous." *Metric Constructors*, 169 F.3d at 752.

FEMA makes the same mistake in its brief, arguing that "because the contract was unambiguous, the board was entirely correct to not consider extrinsic evidence

in the first instance." FEMA Br. at 22. This is precisely the error that the board committed in *Metric Constructors* and this Court reversed.

Credible testimony that "restocking fee" is regularly used in the industry to mean "cancelation fee"—coupled with FEMA's contemporaneous characterization of CLIN 0005 as a "penalty" and the CLIN's description, which does not state that TSI has to incur cost or physically restock any bottles—demonstrates that TSI's interpretation is reasonable. *Metric Constructors* required the Board to consider this evidence before "conclusively" determining whether or not the contract was ambiguous. The Board's refusal to consider trade usage and other "context" cannot be reconciled with *Metric Constructors* and constitutes plain error.

### 2.  TSI Demonstrated Reasonable Reliance On Trade Practice And Custom.

In *Metric Constructors*, the contractor's reliance on trade practice was "reflected in its bid." 169 F.3d at 753. FEMA argues that TSI's expert reports "do not provide specific evidence that TSI relied upon [] trade practice." FEMA Br. at 26, but that ignores the record.

TSI's reliance on the common industry usage of "restocking fee" was reflected in its proposal. FEMA solicited a quote for a "Restock Penalty" and TSI proposed a rate of just $0.20, half the ceiling rate of $0.41 due to the significant quantity in the initial order. Expert testimony provided that, "if CLIN 005 did not act as a cancelation fee or a form of liquidated damages whenever an order was

canceled or quantity reduced, a distributor in TSI's position would have shifted the risk to its proposed unit price for the product." APPX0386. TSI confirmed its understanding that CLIN 0005 would apply upon cancelation, rather than showing it physically returned bottled water, by stating in its proposal response that it can "cancel unshipped loads with 24 hour notice and will be charged a restocking fee." APPX0153. FEMA accepted TSI's terms, specifically adding a 24-hour cancelation requirement to CLIN 0005 in the awarded task order. *See* APPX0173.

TSI also introduced testimony that even before the solicitation, TSI questioned FEMA's initial plan to place an extremely large initial order of 240 million liters and "reminded FEMA that there would be a restocking fee for quantity reductions." APPX0289.

This evidence demonstrates that TSI reasonably relied on the common industry understanding of the term "restocking fee" when entering into the contract, and easily meets the reliance requirement in *Metric Constructors*.

### 3. TSI Preserved Its Right To Engage in Expert Discovery and Timely Submitted Expert Reports.

Like the Board, which found TSI's arguments regarding trade practice "neither timely nor acceptable," APPX0011, FEMA similarly argues that TSI's submission of expert reports was untimely because "TSI did not assert or present any evidence that the phrase 'restocking fee' needed to be interpreted in accordance with trade practice" in its summary judgment motion before the Board. FEMA Br.

at 7. FEMA also insinuates that TSI was obligated to seek reconsideration of the Board's January 27, 2022 decision, which did not grant judgment to either party, but points to no authority. FEMA's arguments mischaracterize the record and are baseless.

While TSI argued in its summary judgment motion that its interpretation of CLIN 0005 was the only reasonable interpretation based on the plain language of the contract, its opposition to FEMA's motion for summary judgment[4] specifically raised the need to consider testimony and other context evidence before construing the contract against TSI, stating that "TSI requests the opportunity to provide testimony on topics including the meaning of 'restocking fee' in commercial practice, FEMA's prior practice under similar CLINs, and the contracting officer's understanding of CLIN 0005 under the Maria Task Order." APPX0465. *See also id.* at APPX0465 (TSI arguing in its opposition that FEMA's conduct prior to the existence of the dispute is relevant to the Board's interpretation of CLIN 0005). Thus, contrary to FEMA's argument, TSI did, in fact, timely assert that the term "restocking fee" should be interpreted in accordance with commercial practice and FEMA's prior conduct, and that the Board should consider the context of the agreement before interpreting CLIN 0005 against TSI.

---

[4] In its decision, the Board noted that "FEMA's cross-motion for summary judgment is not really a motion for summary judgment." APPX0007.

TSI's filing of its own summary judgment motion did not preclude TSI from asserting in its opposition that commercial practice and FEMA's prior conduct should be considered before the Board adopted FEMA's interpretation. "The party against which summary judgment is granted is not estopped by the filing of its own motion for summary judgment from asserting on review that there are genuine issues of material fact which prevent entry of judgment as a matter of law *against it*." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (emphasis added) (quoting *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 324-25 (10th Cir. 1967), for the proposition that a party filing a motion for summary judgment "does not thereby so concede that no issues remain in the event his adversary's theory is adopted").

On motions for summary judgment, the Board was required to resolve reasonable inferences against FEMA, such as the inference that "restocking fee" has a different meaning in the industry that is contrary to FEMA's interpretation, before adopting FEMA's interpretation. *See Promac, Inc. v. West*, 203 F.3d 786, 788 (Fed. Cir. 2000) ("all reasonable inferences must be resolved against the party whose motion is under consideration"); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) (disagreement over intention of the parties "raised a question of material fact underlying the issue of contract interpretation" precluding summary judgment). Here, the Board failed to do so.

The Board's January 27, 2022 decision did not address or acknowledge: (a) the fact that the parties had not yet engaged in any discovery; (b) TSI's explicit request to introduce evidence of trade usage before construing "restocking fee" against TSI; (c) FEMA's contemporaneous characterization of CLIN 0005 as a penalty (even though it was in the parties' joint statement of material facts); (d) TSI's statement of material fact that it cautioned FEMA before ordering such a large initial quantity that it could result in significant "restocking fee" liability, *see* APPX0372; and (d) other relevant context such as FEMA's understanding of CLIN 0005 under a different task order issued under the IDIQ Contract before the dispute between the parties arose. The Board was required to draw reasonable inferences based on each of these in favor of TSI.

Ultimately, however, the Board announced only a preliminary interpretation of CLIN 0005 ("the Board is led to the conclusion that … more must occur than FEMA simply decreasing or cancelling the number of liters ordered," APPX0006), but did not grant summary judgment to either party. The Board's initial interpretation as part of its denial of summary judgment did not establish the law of the case (FEMA does not suggest otherwise) or, absent further order, narrow the scope of the case. The "law of the case doctrine … simply does not apply to a denial of summary judgment." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1356 (Fed. Cir. 2009) (recognizing that determination of a registration as part of a denial

of summary judgment did not foreclose the board "from determining, based upon the entire record (including trial, briefing, and oral argument), what the registration *actually* covers") (emphasis in original). The Board thus permitted the litigation to proceed, ending fact and expert discovery on September 9, 2022. APPX0473. TSI then prepared expert reports addressing trade usage and timely exchanged them by the deadline established by the Board.

Since the Board entered an order setting a deadline for fact and expert discovery without any limitations on its scope, and TSI met that deadline, TSI's submission of the three expert reports was timely. FEMA implies that TSI waived its right to submit these reports showing trade usage by not seeking reconsideration, but Board Rule 26 is permissive, not mandatory.

### 4. The Board's Exclusion Of Expert Reports On The Basis That The Board Already Interpreted The Contract Was Legal Error.

FEMA frames the Board's refusal to consider TSI's three expert reports as an evidentiary ruling subject to an "abuse of discretion" standard of review. *See* FEMA Br. at 23. The correct standard is *de novo*, since this appeal seeks reversal of the Board's erroneous interpretation of the contract. *See Supreme Foodservice GmbH v. Dir. of Def. Logistics Agency*, 54 F.4th 1362, 1367 (Fed. Cir. 2022) ("Contract interpretation is a question of law reviewed without deference."). The Board's refusal to consider evidence of trade usage in direct contradiction of *Metric Constructors* constitutes legal error and is not discretionary.

This is not a case, for example, where the Board weighed the reports but found them unpersuasive and TSI seeks review. The Board readily conceded that considering the reports "would not have changed [the January 2022] decision *because the contract is not ambiguous*." APPX0011 (emphasis added). The Board thus excluded the reports because it had already interpreted the contract, which was contrary to law requiring the Board to consider trade usage of "restocking fee" before conclusively interpreting the contract. Since this violated binding precedent, TSI does not need to show an abuse of discretion. *See Metric Constructors*, 169 F.3d at 753 (the Federal Circuit "examines anew whether the contract specifications at issue here are ambiguous").

But even if an abuse of discretion standard applies, the Board clearly abused it here because its decision was based on legal error—the Board's failure to draw reasonable inferences in favor of TSI when interpreting the contract and then refusal to consider evidence that a term has a different meaning before "conclusively" determining if the contract is ambiguous. *Id.* at 752. *See also Sterling Federal Sys., Inc. v. Goldin*, 16 F.2d 1177, 1182 (Fed. Cir. 1994) (the Board abuses its discretion when its decision is "based on an erroneous conclusion of law") (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)).

### 5.  FEMA Did Not Timely Produce Expert Reports.

FEMA complains that TSI engaged in "tactics" by producing experts reports in compliance with the Board's deadline for expert discovery and calls it "ridiculous" that TSI would characterize its own expert reports as uncontested. FEMA Br. at 25-26. But it is true that FEMA did not introduce any expert reports countering TSI's expert testimony showing, among other things, that "restocking fee" has a particular meaning in the bottled beverage industry.

On July 15, 2022, after the Board denied summary judgment and issued several orders extending the schedule, the parties jointly agreed to resolve the case through a record submission under Board Rules 18 and 19 and proposed a schedule for the completion of discovery without any limitations. APPX0469. The Board adopted the joint schedule without limiting the scope of discovery, requiring FEMA to produce any expert reports by August 26, 2022, closing expert discovery on September 9, 2023, and requiring FEMA to supplement the record by September 23, 2022. APPX0472-0473.

TSI submitted expert reports prior to the deadline and close of the record. FEMA did not. Under Board Rule 13, "[u]nless otherwise ordered, the scope of discovery is the same as under Rule 26(b)(1) of the Federal Rules of Civil Procedure." Since the Board did not "otherwise" limit the scope of discovery when granting the parties' joint schedule, and the Board's denial of summary judgment

did not establish the law of the case precluding a different interpretation "based upon the entire record (including trial, briefing, and oral argument)," *Aycock*, 560 F.3d at 1356, FEMA should not have disregarded the Board's schedule.

### D. FEMA Does Not Explain Its Contemporaneous Description of CLIN 0005 As A "Penalty" And The Application Of The Restocking Fee To "Unshipped Loads."

In the joint statement of undisputed material facts, the parties agreed that FEMA's solicitation for the Maria Task Order described the CLIN 0005 fee as a "Restock Penalty" and that TSI's proposal provided that it will be charged a "restocking fee" for canceling "unshipped loads." APPX0156; APPX0153. The contract incorporated this understanding by expressly agreeing to TSI's request for notice of 24 hours before canceling an order. *See* APPX0173 ("As requested by the vendor …"). These facts bear directly on the parties' contemporaneous understanding of CLIN 0005. And since FEMA memorialized this exchange in the Maria Task Order, it is not extrinsic evidence but part of the contract and must be considered when interpreting CLIN 0005.

The Board did not mention, much less explain, FEMA's characterization of CLIN 0005 as a "penalty," TSI's proposal, or FEMA's memorialization of this exchange in the Maria Task Order when it issued either of its substantive decisions. FEMA likewise fails to address any of these facts in its brief.

Since the purpose of contract interpretation is to ascertain the intent of the parties, it was legal error for the Board to disregard this undisputed context. *See N. Pac. Emergency Exp. Ass'n. v. United States*, 95 Ct. Cl. 430, 449-50 (1942) ("The intent of the parties prevails whenever it can be ascertained.") (citing *George v. Tate*, 102 U.S. 564 (1880)); *Metric*, 169 F.3d at 752 (Board "must consult the context in which the parties exchanged promises" as that "context may well reveal that the terms of the contract are not, and never were, clear on their face.").

### E. The Board's Refusal To Consider The Florence Task Order Was Error.

FEMA suggests that its prior interpretation of "restocking fee" as a cancelation fee—paid based solely on the quantity of liters canceled, not physically restocked—is not relevant because the Florence Task Order had a different contracting officer and FEMA canceled less than a million liters representing a "single day of shipment," whereas it canceled more than 67 million liters under the Maria Task Order. FEMA Br. at 28-30. These alleged distinctions are irrelevant.

Contrary to FEMA's suggestion, the contracting officer who issued the solicitation resulting in the award of the Maria Task Order, where she called CLIN 0005 a "restocking penalty," is the same contracting officer who agreed to pay TSI the same CLIN 0005 fee under the Florence Task Order based only on the quantity reduced, not evidence of the quantity physically restocked. *See* APPX0155-0156, APPX0091.

TSI presented all relevant details regarding FEMA's payment of the "restocking fee" to the Board, including the fact that "FEMA did not require TSI to produce documentation demonstrating its actual costs associated with the decrease in the initial ordering quantity" and "did not require TSI to demonstrate that it had … 'actually incurred costs to restock' the decreased quantity of bottled water, as FEMA later did with respect to the Maria Task Order." APPX0371. In its opposition, *FEMA conceded all of these facts*, stating that they were "Undisputed." APPX0443.

Yet the Board did not even mention the Florence Task Order or the fact that FEMA did not dispute that it paid the CLIN 0005 fee without requiring evidence of physical restocking or the incurrence of costs in its initial January 27, 2022 decision. Later, in its decision resolving the appeal, the Board again ignored FEMA's admission of these relevant facts, stating only that it "could not give weight to TSI's allegation about its prior dealings with FEMA because we have no reliable evidence" to determine if the circumstances "were similar." APPX0016. The Board inexplicably failed to recognize that FEMA had already conceded the pertinent facts. FEMA's response stating that these facts were "Undisputed" means the Board, in fact, had reliable data upon which to consider FEMA's prior conduct—namely, its payment of the "restocking fee" based on the quantity reduced and without seeking evidence that TSI actually incurred restocking costs.

It is highly probative that, before the instant dispute arose, FEMA paid TSI the CLIN 0005 fee for the quantity canceled without requiring proof of the quantity of liters physically restocked or any evidence of costs incurred—the very criteria that FEMA now tells this Court is essential for payment of the fee.

FEMA guesses that the contracting officer "might have assumed" that TSI physically restocked the same quantity, and suggests this might just be "an instance where those two numbers happened to be the same." FEMA Br. at 29-30. But FEMA already admitted the salient facts in opposition. The Board's disregard of this evidence was contrary to the record, the parties' stipulations, and ultimately the law, which required the Board to consider this information as indicative of how FEMA intended the "restocking fee" to operate. *See WDC W. Carthage Assocs. v. United States*, 324 F.3d 1359, 1363 (Fed. Cir. 2003) ("interpretation of contract by the parties before contract becomes the subject of controversy is deemed to be of great, if not controlling weight").

TSI never argued that FEMA's conduct under the Florence Task Order is dispositive to the interpretation of CLIN 0005, but it is relevant to the reasonableness of the parties' respective interpretations presented here. FEMA's contemporaneous conduct before the dispute arose—paying the CLIN 0005 fee based on the quantity of liters reduced from the initial order without requiring evidence of the two elements

FEMA insists are necessary for the fee to apply—is consistent only with TSI's interpretation.

FEMA suggests *Chase & Rice, Inc. v. United States*, 354 F.2d 318 (Ct. Cl. 1965) is distinguishable because the parties in that case made a "specific statement interpreting the contract terms," FEMA Br. at 30, but such a statement merely goes to the evidence. It does not in any way limit binding precedent requiring reviewing courts to give the parties' interpretation before a dispute arises "great, if not controlling weight." *Id.* at 321.

FEMA argues *WDC W. Carthage* is distinguishable because this Court found that contract otherwise unambiguous, *see* FEMA Br. at 30, but that is immaterial. This Court specifically noted the government's previous interpretation of the contract based on its payment of certain replacement costs as supporting the reasonableness of the contractor's interpretation—precisely what the Board was required to do here.

FEMA's attempt to distinguish *Reliable Contracting*, 779 F.3d 1329, on the basis that the instant case involves "two different and district [sic] factually distinct situations" is nonsensical. FEMA Br. at 31. *Reliable Contracting* affirmed longstanding precedent that "evidence of contemporaneous beliefs about the contract is particularly probative of the meaning of a contract." 779 F.3d at 1332 (citing *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982),

and *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1240 (Ct. Cl. 1970) (en banc) (per curiam)). FEMA does not attempt to differentiate other cases cited by TSI, such as the Supreme Court's instruction that "[t]here is no surer way to find out what parties meant, than to see what they have done." *Brooklyn Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269, 273 (1877). *See Central Eng'g & Const. Co. v. United States*, 103 Ct. Cl. 440, 465 (1945) (citing *Brooklyn Life* for the same proposition).

FEMA's payment of the CLIN 0005 fee to TSI (at $0.41/liter, twice the price at issue here) based only on the quantity of liters reduced, rather than requiring TSI to prove that it had incurred cost physically restocking bottled water, occurred under the *same IDIQ Contract* and thus *same CLIN* at issue here. Therefore, it is probative of the meaning of CLIN 0005 and entitled to "great, if not controlling weight." *WDC W. Carthage*, 324 F.3d at 1363.

## F. If TSI's Interpretation Is Not The Only Reasonable One, *Contra Proferentem* Applies.

FEMA does not argue that any ambiguity is patent. Instead, it argues only that TSI is not entitled to *contra proferentem* because TSI did not demonstrate that it relied on its current interpretation. *See* FEMA Br. at 33. As explained above, the record readily demonstrates that TSI relied on the common industry understanding of the term "restocking fee" when entering into the Maria Task Order.

## CONCLUSION AND STATEMENT OF RELIEF

For these reasons, the Court should reverse the Board's decision.

Dated: September 18, 2023

Lindsay M. Reed
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
(202) 344-8300
lmreed@venable.com

Respectfully submitted,

 /s/James Y. Boland
James Y. Boland
VENABLE LLP
1850 Towers Crescent Plaza, Suite 400
Tysons, VA 22182
(703) 760-1997
jyboland@venable.com

*Counsel for Appellant Team Systems International, LLC*

**ADDENDUM**

**FEDERAL RULE OF APPELLATE PROCEDURE 32.1(b)**



**UNITED STATES**
**CIVILIAN BOARD OF CONTRACT APPEALS**

ORDER: July 18, 2022

CBCA 7145

TEAM SYSTEMS INTERNATIONAL LLC,

Appellant,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

James Y. Boland of Venable, LLP, Tyson, VA; and Christopher G. Griesedieck and Lindsay M. Reed of Venable, LLP, Washington, DC, counsel for Appellant. George L. Miller of Miller, Coffey, Tate, LLP, Philadelphia, PA, Trustee for Appellant.

Rafael Lara, Jr., Jeffrey D. Webb, and Sarah Award, Matthew Lane of Office of Chief Counsel, Federal Emergency Management Agency, Department of Homeland Security, Washington, DC, counsel for Respondent.

**SHERIDAN**, Board Judge.

<u>ORDER</u>

Based on the parties' joint submission, the following due dates are set for a decision on the record in the above captioned case.

**Thursday, August 18, 2022**, TSI responds to FEMA's pending written discovery requests and FEMA responds to TSI's pending written discovery requests.

**Friday, August 26, 2022**, any expert reports due to the other party.

**Friday, September 9, 2022**, fact and expert discovery ends.

**Friday, September 23, 2022**, deadline for submission of material for inclusion in the record.

 **Wednesday, October 5, 2022**, joint statement of the issues and statement of facts.

**Wednesday, October 19, 2022**, TSI's initial brief.

**Tuesday, November 15, 2022**, FEMA's initial brief.

**Monday, November 28, 2022**, TSI's reply brief.

**Thursday, December 15, 2022**, FEMA's reply brief.

PATRICIA J. SHERIDAN
Board Judge

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1556

**Short Case Caption:** Team Systems International v. Department of Homeland Security

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  6,785  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 09/18/2023                Signature: /s/James Y. Boland

                                Name: James Y. Boland